IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | Case No. 12-00080-01-CR-W-HFS |
| KIRK A. WARD, ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Ward's Motion to Suppress Evidence (doc #26). For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On March 7, 2012, a criminal complaint was filed charging defendant Kirk A. Ward with being a felon in possession of a firearm.

On March 13, 2012, the Grand Jury returned a one-count indictment against defendant Ward. The indictment charges that on March 6, 2012, defendant Ward, having been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed a firearm which had been transported in interstate commerce.

On July 12, 2012, an evidentiary hearing was held on defendant's motion to suppress. Defendant Ward was represented by Assistant Federal Public Defender Stephen C. Moss. The Government was represented by Assistant United States Attorney Shalanda J. Smith and Assistant United States Attorney Bruce E. Clark. The Government called Officer Garrett Lynch, Officer Jeffrey Bauerle, Detective Teddy Taylor and Detective Mario Florido of the Kansas City, Missouri Police Department as witnesses. The defense called no witnesses to testify.

II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On March 6, 2012, two search warrants were executed at a residence at 4030 South Benton. (Tr. at 3,40-41) During the execution of the first search warrant for stolen property, tactical officers observed purported cocaine, marijuana, firearms and scales in plain view. (Tr. at 32-33; Government's Ex. 1 at 1) Detective Teddy Taylor, who is assigned to the Drug Enforcement Unit, received a call that drugs and firearms had been observed in plain view during the execution of a search warrant and he then applied for and obtained a second search warrant to search for cocaine, marijuana, firearms, U.S. currency and narcotics paraphernalia. (Tr. at 31-33, 43; Government's Ex. 1) The second search commenced at approximately 8:30 p.m. (Tr. at 49)

2. Officers Garrett Lynch and his partner, Jeffrey Bauerle assisted detectives with the second search warrant for narcotics. (Tr. at 33-34) Officers Lynch and Bauerle were assigned to secure the area so that no one entered the house during the search and to provide a visible police presence outside the residence. (Tr. at 3, 5, 35) Officers Lynch and Bauerle were sitting in a marked patrol car in a driveway to the north of 4030 South Benton. (Tr. at 3-5) In addition to providing security, Officers Lynch and Bauerle were running serial numbers off of items that were found inside the residence for the detectives who were searching the residence. (Tr. at 3-4) The officers were asked to run the items through the computer to see if the items were stolen. (Tr. at 35) The officers' attention was divided between running the serial numbers and watching the residence. (Tr. at 15, 22)

3. Officers Lynch and Bauerle observed defendant Ward as he approached 4030 South Benton. (Tr. at 5, 22) Ward walked through the yard on the south side of the residence. (Tr. at 5-6) The officers watched Ward walk up the steps and onto the front porch. (Tr. at 6, 22) Officer Lynch and Bauerle did not notice anything unusual or suspicious about Ward. (Tr. at 10, 25) In fact, the officers thought that Ward might be a plain clothes detective, as detectives were coming in and out of the residence during the search. (Tr. at 15, 23) Officer Lynch testified that he saw a detective approach Ward as he was going into the residence. (Tr. at 6) Officer Bauerle testified that he saw Detective Teddy Taylor with Ward at the door of the residence. (Tr. at 23) Detective Taylor had Ward's hands behind his back. (Tr. at 23) Officer Bauerle was not sure if Ward had gotten inside the residence. (Tr. at 23, 25) Officer Bauerle testified that he believed the front door of the residence was open. (Tr. at 26) Detective Taylor testified that he believed the screen door was shut, but that the front door was damaged during the execution of the first search warrant and, therefore, would have been open. (Tr. at 36, 45, 51)

4. Detective Taylor testified that he was searching inside the residence when he head a door shut. (Tr. at 38) Detective Taylor looked up and saw a person standing in the entryway whom he did not recognize. (Tr. at 38) The person standing in the entryway had a beer in his hand. (Tr. at 38) Detective Taylor said something to the effect of who are you? (Tr. at 38) The person (defendant Ward) said that this was his uncle's house. (Tr. at 39) Ward then bent over and set the beer down. (Tr. at 38) Detective Taylor ran over and grabbed Ward, put him up against the wall and placed his hands behind his back. (Tr. at 38-39) Detective Taylor viewed Ward as a potential threat in that he had entered a crime scene. (Tr. at 55, 57) Detective Taylor did not have any handcuffs on him because the residence was supposed to be secure. (Tr. at 39) Detective Taylor took Ward out to the front porch. (Tr. at 39) It was approximately 9:52 p.m. (Tr. at 52) In his report, Detective Taylor wrote: "Due to the recovery of narcotics and firearms from inside the aforementioned address, I held Ward's hands behind his back and escorted him onto the porch to establish his

2

  identity and whether he was a resident." (Defendant's Ex. 1 at 1)

5.  Detective Mario Florido was also searching inside the residence when defendant Ward entered the residence. (Tr. at 58-59, 67-68) Detective Florido heard Detective Taylor say something to the effect of, who are you, what are you doing here, let me see your hands. (Tr. at 68) That was when Detective Florido turned around to the doorway and saw Ward standing inside the front door. (Tr. at 68) Detective Taylor was already escorting Ward out on the front porch. (Tr. at 68) Detective Florido testified that the main door to the residence was open, but the screen door was closed. (Tr. at 69) Detective Florido further testified that Ward was perceived as a threat to the officers' safety because he came on the premises while officers were searching for evidence of a crime. (Tr. at 70)

6.  Detective Taylor motioned to Officers Lynch and Bauerle and they exited their patrol car and went up to the residence to help the detective. (Tr. at 6, 23, 60) Detective Taylor let the officers know that defendant Ward was not supposed to be there. (Tr. at 11) Officer Lynch told Ward that he was going to frisk him. (Tr. at 7) As Officer Lynch started to pat-down Ward and perhaps even before Lynch touched Ward, Ward told Lynch that he had a weapon on his right side. (Tr. at 7, 12, 14, 23, 40) Officer Lynch retrieved the fully loaded .38 caliber revolver. (Tr. at 7, 23; Defendant's Ex. 1 at 1) Ward then advised that he was a felon. (Defendant's Ex. 1 at 1)

7.  Detective Taylor testified that defendant Ward was frisked pursuant to an unwritten standard policy that anyone who enters into a crime scene where drugs were involved while officers are still processing the scene will be frisked. (Tr. at 61-62)

### III. DISCUSSION

  Defendant Ward seeks to suppress all evidence and testimony relating to such evidence obtained as a result of his detention and search on the basis that such evidence was obtained in violation of his Fourth Amendment rights. (Motion to Suppress Evidence at 1) In support of his motion, defendant argues that because the police had no reasonable suspicion that he was involved in criminal activity or armed and dangerous, his detention and the frisk of his person were unreasonable under the Fourth Amendment. (Id. at 2) Defendant cites the case of United States v. Clay, 640 F.2d 157, 161 (8th Cir. 1981), for the proposition that the Fourth Amendment does not authorize the detention of any person entering the premises during the execution of a search warrant. (Motion to Suppress Evidence at 3)

  In United States v. Clay, 640 F.2d 157, 158 (8th Cir. 1981), the defendant approached the house where a search warrant was being executed and knocked on the storm door. A police officer opened the door and ordered the defendant into the house. Id. The defendant was then subjected

3

to a pat down search. Id. The Eighth Circuit Court of Appeals found that the officer should have allowed the defendant an opportunity to explain his presence before subjecting him to a search. Id. at 161.

In United States v. Patterson, 885 F.2d 483, 484 (8th Cir. 1989), the defendant arrived at a residence in a van that was registered to the owner of the residence during the execution of a search warrant. The defendant came to the front door of the residence and was met by a police officer who was not in uniform. Id. The officer invited the defendant in and advised him that a search was in process pursuant to a warrant. Id. The defendant was asked as to his business at the premises. Id. The defendant stated that he had purchased a van from the owner of the residence and that he needed some paperwork to straighten out a hitch in the transaction. Id. At that point, the officer subjected the defendant to a pat down search. Id. The court distinguished the Clay case finding that in Clay there was nothing prior to the frisk which connected the defendant with the residence being searched or to the occupants of or activities at that site. Id. at 484. The court found the pat down search of defendant Patterson reasonable, stating:

> ... Police may ... take appropriate action to ensure their own protection while carrying out a search warrant. Clay, 640 F.2d at 160. In this case, the officer was rightfully in the presence of Patterson and was armed with sufficient facts to be concerned about his safety and that of his fellow officers. The possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances. No one forced Patterson to arrive in what was thought to be Williamson's van or to approach the premises, by then known to be a drug vending site, or to knock and then enter the house when asked to do so. Patterson was not "ordered" into the house nor forced inside at gunpoint or otherwise. Simply stated, this is not a case that falls within the ruling in Clay. The search and seizure was constitutional.

Patterson, 885 F.2d at 484-85.

Other courts have found that police have authority to make a limited search of an individual present during the execution of a search warrant as a self-protective measure. See Rivera v. United States, 928 F.2d 592, 606 (2nd Cir. 1991). In Collier v. Locicero, 820 F. Supp. 673 (D. Conn. 1993), the court found:

4

> [T]he failure to conduct brief frisks during the execution of search warrants would seriously jeopardize the lives and safety of police officers. It is clear that police officers who enter a building to execute a search warrant expose themselves to the risk of assault by persons whom they encounter during the search. To permit police officers to reduce this risk, courts have recognized the officers' right to conduct brief frisks of all persons on the premises being searched. ... These frisks, though limited, serve the essential function of ensuring that police officers have an opportunity to discover concealed weapons. Given the obvious importance of uncovering such weapons, the courts have permitted police officers to frisk all occupants of premises being searched without regard to any particularized suspicion that the officers may have.

Id. at 681.

The record in this case establishes that on March 6, 2012, at approximately 9:52 p.m., while officers were conducting a search of a residence at 4030 South Benton pursuant to a warrant and where cocaine, marijuana, firearms and scales had already been discovered, defendant Kirk Ward opened the front screen door and entered the residence. (See Fact Nos. 1, 3 and 4, supra) Defendant Ward was able to bypass the officers assigned to secure the area because their attention was divided between running serial numbers and watching the residence and because they thought that Ward might be a plain clothes detective, as detectives were coming in and out of the residence during the search. (See Fact Nos. 1-3, supra) When Detective Taylor, who was searching inside the residence, first saw Ward enter the residence, he asked Ward who he was and Ward responded that this was his uncle's house. (See Fact No. 4, supra) Ward then bent over and set his beer down. (Id.) Ward obviously had a connection to the residence and to the occupants of the residence in that he did not even knock before entering the residence. Detective Taylor viewed Ward as a potential threat in that he had entered a crime scene where narcotics and firearms had been recovered. (Id.) Detective Florido, another detective who was searching the residence when Ward entered, testified that he also perceived Ward as a threat to the officers' safety because he came on the premises while officers were searching for evidence of a crime. (See Fact No. 5, supra) Detective Taylor, who did not have any handcuffs on his person, took Ward out to the porch where the uniformed officers could help him secure Ward. (See Fact Nos. 4 and 6, supra) Detective Taylor intended to establish Ward's identity and whether he was a resident. (See Fact No. 4, supra) Detective Taylor testified that

5

defendant Ward was frisked pursuant to an unwritten standard policy in that Ward had entered into a crime scene where drugs were involved while officers were still processing the scene. (See Fact No. 7, supra)

The Court finds that the officers were justified in conducting the frisk of defendant Ward for safety reasons without regard to any particularized suspicion. As set forth in United States v. Patterson, 885 F.2d 483, 485 (8th Cir. 1989), "The possible danger presented by an individual approaching and entering a structure housing a drug operation is obvious. In fact, it would have been foolhardy for an objectively reasonable officer not to conduct a security frisk under the circumstances." There was no violation of defendant's constitutional rights.

## IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Ward's Motion to Suppress Evidence (doc #26).

Counsel are reminded they have fourteen days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                        */s/ Sarah W. Hays*
                                        SARAH W. HAYS
                    UNITED STATES MAGISTRATE JUDGE